UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

James J. Abraham, Jr.

    v.                                            Civil No. 23-cv-338-LM
                                                Opinion No. 2024 DNH 077 P

Hillsborough County Department
of Corrections, et al.

**O R D E R**

Plaintiff James J. Abraham, Jr. brings this action against Hillsborough County, various corrections officers and nursing staff employed by Hillsborough County, American Institutional Medical Group, LLC and its Manager, and Elliot Health System ("Elliot"). Abraham's claims stem from his detention and medical treatment following his arrest in July 2020. In Count VI, Abraham brings a false imprisonment claim against Elliot. Elliot moves to dismiss Count VI pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. no. 31. For the following reasons, Elliot's motion is granted.

**STANDARD OF REVIEW**

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679. When considering a 12(b)(6) motion, the court is generally limited to the facts alleged in the complaint, but it may also consider documents attached to the complaint, documents the authenticity of which is not disputed, matters of public record, and documents sufficiently referred to in the complaint. See Foley, 772 F.3d at 74; Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993); Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008).

## BACKGROUND[1]

On July 2, 2020, at 11:00 p.m., officers from the Nashua Police Department responded to a report of domestic violence at Abraham's residence. According to a police report from the incident, Abraham's family was concerned that Abraham was suffering from a "Bi-polar breakdown" and that he had recently become manic due to discontinuing his medications. Doc. no. 29-3 at 1. When officers arrived at the residence, Abraham's son was physically restraining him. Abraham's son claimed that Abraham punched him in the face and threatened to kill him. Emergency medical personnel attempted to provide Abraham with medical care and an evaluation, but Abraham was uncooperative. Nor did Abraham agree to a voluntary evaluation at the hospital. The officers arrested Abraham and took him to the

---

[1] The following facts are drawn from Abraham's amended complaint and the exhibits attached thereto.

Nashua Police Department for booking and processing. Abraham refused the services of a bail commissioner.[2]

Early the next morning, on July 3, 2020, police transported Abraham to the Valley Street Jail ("Valley Street"), which is operated by defendant Hillsborough County. Abraham had a physical altercation with officers later that morning. Around 11:00 p.m. on July 3, Abraham was transported to Elliot Hospital[3] for medical care. He remained at Elliot Hospital until July 6, when he was brought back to Valley Street.[4] During the early hours of July 7, Abraham began screaming, and kicking and punching the walls and fixtures in his cell. Officers intervened and strapped Abraham into a restraint chair until 5:00 a.m.

Later that same day, a Justice of the New Hampshire Circuit Court conducted Abraham's arraignment and bail hearing. The court issued an order setting Abraham's bail at preventative detention. See doc. no. 29-11. The bail order specified, however, that Abraham's bail would automatically convert to personal recognizance upon his entry to Elliot Hospital or another appropriate facility or

---

[2] Under New Hampshire law, persons subject to warrantless misdemeanor arrests are generally entitled to the services of a bail commissioner immediately after they are booked and processed by the arresting agency. See RSA 597:2-b, I. A bail commissioner is authorized to set the defendant's bail and conditions of release in much the same way as a judge. See RSA 597:15, :15-a, :18. When a defendant refuses the services of a bail commissioner, however, he remains incarcerated pending his arraignment.

[3] Elliot operates Elliot Hospital.

[4] Abraham's false imprisonment claim does not relate to his hospitalization from July 3 through July 6. See doc. no. 38-1 at 5.

hospital for an involuntary emergency admission ("IEA"). The bail order further specified that, if Abraham "leaves the treatment facility prior to successful completion, leaves against medical advice or fails to comply with follow-up treatment, bail shall immediately revert to . . . preventative detention." Id. at 1. The order provided that the Hillsborough County Sheriff's Office would transport Abraham to the appropriate facility.

Abraham was transported to Elliot Hospital on July 8 and underwent a mental health evaluation. The evaluation was conducted by Physician's Assistant ("PA") Abigail Gibbs of the Mental Health Center of Greater Manchester. As of the date of Abraham's evaluation, PA Gibbs was authorized to complete IEA certificates. In completing the evaluation, PA Gibbs noted that Abraham acknowledged he suffered from Bipolar II disorder, that he had stopped taking his medications, and that he had not been sleeping or eating. According to PA Gibbs, Abraham presented with disordered thinking and answered questions in a tangential and indirect manner. He appeared limitedly oriented and did not know the day of the week. His speech was fast and pressured, and he exhibited paranoid and defensive thought content. He also made comments about wanting to harm a corrections officer at Valley Street. PA Gibbs also spoke with Abraham's son, who corroborated that Abraham had not slept in over a week and that his manic symptoms had severely escalated since discontinuing his Bipolar medications.

PA Gibbs consulted with a psychiatrist, and the psychiatrist determined that Abraham met criteria for an IEA. PA Gibbs thereafter completed an IEA certificate.

4

However, the certificate did not specify the Designated Receiving Facility ("DRF") at which Abraham would be involuntarily confined pursuant to the IEA. Nor did it specify the means by which Abraham would be transported to the DRF. PA Gibbs noted that the certificate was "completed with the intention of the client returning to jail to await bed placement." Doc. no. 29-22 at 3.

Abraham was returned to Valley Street on July 8 after completion of the IEA certificate. His physical and mental condition continued to deteriorate. He yelled, flooded his cell, continued experiencing manic symptoms, and reported experiencing suicidal ideation and auditory hallucinations.

Abraham was brought back to Elliot Hospital on July 13 and underwent another mental health evaluation for a "72-hour re-assessment of his IEA." Doc. no. 29-23 at 1. Dr. Emery Johnston of the Mental Health Center of Greater Manchester completed Abraham's evaluation. Like PA Gibbs, Dr. Johnston was authorized to certify IEAs as of July 2020. Dr. Johnston reported that Abraham exhibited "a diminished ability to care for himself," as well as "agitation, tangentiality, and limited orientation." Id. He exhibited paranoid and perseverative thought content, pressured speech, lability, and an unkempt appearance. He endorsed suicidal ideation and demonstrated impaired memory, insight, and judgment.

Dr. Johnston completed another IEA certificate. As with the prior certificate, however, this certificate did not specify the DRF that Abraham would be brought to or the means by which he would be transported there. The physician noted that Abraham would be "h[eld] at Valley St. Jail until a bed is assigned." Id. at 3.

5

Abraham was returned to Valley Street on July 13. He continued to decompensate. He smeared feces on the floor of his cell, struck an officer, drank his own urine, and could not inform a nurse who or where he was. On July 15, Abraham was transported to a DRF—New Hampshire Hospital—pursuant to the IEA.

Abraham subsequently instituted this action. In Count VI of the amended complaint, he brings a false imprisonment claim against Elliot. He states that Elliot completed an IEA certificate on July 8 and again on July 13, but he was not transported immediately to a DRF upon completion of either certificate. He alleges that Elliot "failed to release [him] from his confinement at Elliot Hospital despite its statutory duty [under New Hampshire's statutory IEA framework] to deliver [him] to a proper receiving facility." Doc. no. 29 ¶ 202. He further alleges that "[i]t was substantially certain" that he "would remain unlawfully confined in the limited space of Elliot Hospital" as a result of Elliot's failure to deliver him to a DRF. Id. ¶ 201. Ultimately, he alleges that "[t]he holding of James J. Abraham, Jr. by Elliot Hospital . . . constituted the tort of false imprisonment." Id. ¶ 200.

## DISCUSSION

Elliot moves to dismiss Count VI. Elliot contends that Abraham was lawfully detained pursuant to the New Hampshire Circuit Court's bail order prior to completion of the IEA certificate on July 8, and that once his IEA certificate was completed, he was in the custody of the New Hampshire Department of Health and Human Services ("DHHS"). Because Abraham has not plausibly alleged he was in

Elliot's custody, Elliot asserts that Abraham fails to state a false imprisonment claim upon which relief could be granted. Abraham objects, arguing that Elliot failed to designate the DRF that Abraham would be delivered to on his IEA certificates and further failed to designate the means by which he would be transferred to such DRF. Instead, Abraham asserts, Elliot "directed" that Abraham be brought back to Valley Street, despite Elliot "having no legal authority to hold plaintiff in a jail after certifying him for an IEA." Doc. no. 38 at 2.

The parties agree that New Hampshire law governs Abraham's false imprisonment claim. To state a false imprisonment claim under New Hampshire law, a plaintiff must plausibly allege that: "(1) the defendant acted with the intent of confining him within boundaries fixed by the defendant; (2) the defendant's act directly or indirectly resulted in the plaintiff's confinement; (3) the plaintiff was conscious of or harmed by the confinement; and (4) the defendant acted without legal authority." Farrelly v. City of Concord, 168 N.H. 430, 445 (2015).

The parties' arguments require an overview of New Hampshire's statutory framework governing IEAs. This statutory framework has been the subject of substantial recent litigation in this court, see, e.g., Doe v. Comm'r, N.H. Dep't of Health & Hum. Servs., 657 F. Supp. 3d 206 (D.N.H. 2023), as well as published opinions in the New Hampshire Supreme Court and the First Circuit, see Doe v. Comm'r of N.H. Dep't of Health & Hum. Servs., 174 N.H. 239 (2021); Doe v. Shibinette, 16 F.4th 894 (1st Cir. 2021). A brief summary of that framework follows.

7

RSA chapter 135-C is entitled: "New Hampshire Mental Health Services System." RSA ch. 135-C. Under that chapter, DHHS is authorized to "[e]stablish, maintain, and coordinate a comprehensive, effective, and efficient system of services for persons with mental illness." RSA 135-C:1, I(a), -C:3. Chapter 135-C provides for voluntary and involuntary admissions to the state's mental health services system, as well as for admissions on an emergency and nonemergency basis. Doe, 174 N.H. at 248-49. Only involuntary emergency admissions, or IEAs, are at issue in this case.

IEAs are governed by RSA 135-C:27 through -C:33. A person is eligible for an IEA if his mental condition poses "a likelihood of danger to himself or others." RSA 135-C:27. The statute sets forth that a person poses a danger to himself when he has threatened to commit suicide within the previous forty days and there is a likelihood "that an act or attempt of serious self-injury will occur if admission is not ordered," RSA 135-C:27, I(b), or when "[t]he person's behavior demonstrates that he so lacks the capacity to care for his own welfare that there is a likelihood of death, serious bodily injury, or serious debilitation if admission is not ordered," RSA 135-C:17, I(c).

An IEA "may be ordered upon the certificate of" an approved medical provider following a mental health evaluation and, if appropriate, a physical examination. RSA 135-C:28, I. One must qualify to be a medical provider approved to order IEAs, and DHHS is required to maintain a list of approved medical providers. See id.; N.H. Admin. R. He-M 614.06(a). Although approved medical

8

providers are often employed by private healthcare facilities or community mental health programs, see RSA 135-C:28, I, when an approved medical provider completes an IEA certificate he or she is acting as part of the state mental health services system, Doe, 174 N.H. at 258. In other words, "[a]lthough approved medical providers conduct the IEA-certification process in a private hospital, they do so as part of the state mental health system and do not admit IEA-certified patients into the private hospitals." Doe, 657 F. Supp. 3d at 212.

The IEA certificate must identify the DRF in the state mental health services system, such as New Hampshire Hospital, where the IEA-certified patient is to be admitted. RSA 135-C:28, I; see also RSA 135-C:26, I (providing that DRFs include New Hampshire Hospital and other facilities approved by DHHS "for the care, custody, and treatment" of IEA-certified patients). The patient "must be delivered 'immediately' to the facility identified in the certificate." Doe, 174 N.H. at 252 (quoting RSA 135-C:29, I). The approved medical provider who completes the IEA certificate "shall determine" whether the patient is to be transported to the identified DRF via ambulance or law enforcement. RSA 135-C:29, II.

Upon completion of the IEA certificate, the person is deemed by law to be in the custody of DHHS. Doe, 174 N.H. at 252. The person is not free to leave and "may be released only if the certificate is rescinded." Doe, 174 N.H. at 252-53. This is true regardless of whether the patient is immediately admitted to a DRF. See id. at 253-54.

In this case, Abraham contends that he has alleged sufficient factual content for the court to reasonably infer that Elliot "bears liability for false imprisonment connected with [Abraham's] incarcerations at [Valley Street], first from July 8, 2020, through July 13, 2020, and then again from July 13, 2020, through July 15, 2020." Doc. no. 38-1 at 5. As an initial matter, whether the complaint pleads sufficient factual content for the court to draw this inference is not germane to whether Abraham has stated a claim for false imprisonment as alleged in the amended complaint. The amended complaint specifically alleges that Elliot falsely imprisoned Abraham <u>at Elliot Hospital</u>, not in "connect[ion] with" his incarceration at Valley Street. <u>Id.</u>

For example, the amended complaint alleges that Elliot is liable for false imprisonment because "[i]t was substantially certain that by not transferring [Abraham] to New Hampshire Hospital after completion of the IEA, [Abraham] would remain unlawfully confined in the limited space of Elliot Hospital." Doc. no. 29 ¶ 201. The amended complaint also alleges that Abraham "did not consent to be confined at Elliot Hospital," and that he "was aware of his confinement at Elliot Hospital." <u>Id.</u> ¶¶ 203, 205. It further alleges that Elliot "failed to release [Abraham] from his confinement at Elliot Hospital despite its statutory duty [under RSA chapter 135-C] to deliver [Abraham] to a [DRF]." <u>Id.</u> ¶ 202.

Despite the amended complaint taking square aim at an act of false imprisonment alleged to have occurred at Elliot Hospital, Abraham's objection to Elliot's motion to dismiss asserts that he has pleaded sufficient facts for an

10

altogether different claim: that Elliot somehow falsely imprisoned him at Valley Street. Although Abraham claims that the approved medical providers who completed his IEA certificates "directed" or "ordered" that Abraham be incarcerated at Valley Street, doc. no. 38-1 at 2-3, the amended complaint does not plead factual content sufficient for the court to reasonably infer that doctors or physician's assistants at Elliot Hospital have the power to order a county jail to imprison someone. See Farrelly, 168 N.H. at 445 (false imprisonment claim requires demonstration that defendant "acted with the intent of confining [the plaintiff] within boundaries fixed by the defendant").[5] More fundamentally, however, even if the complaint did somehow plead sufficient factual content for the court to reasonably draw this inference, the amended complaint makes clear that Abraham's false imprisonment claim relates to his confinement <u>at Elliot Hospital</u>, not at Valley Street.

The amended complaint alleges that Abraham was present at Elliot Hospital on July 8 and July 13, 2020. With respect to July 8, Abraham was subject to a New Hampshire Circuit Court Bail order requiring that he be preventatively detained until he could be brought to Elliot Hospital or a similar facility to complete an IEA. Once at Elliot Hospital on July 8, PA Gibbs determined, in consultation with a

---

[5] While both PA Gibbs and Dr. Johnson made notations on Abraham's mental health evaluations that he would await DRF placement at Valley Street, the court cannot reasonably infer from these notations—even construing all inferences in Abraham's favor—that either medical professional "directed" or "ordered" Valley Street to imprison Abraham. Rather, the only reasonable inference that can be drawn from these notations is that Abraham was subject to a criminal bail order requiring that he be preventatively detained unless subject to an IEA.

11

psychiatrist and after a mental health evaluation, that Abraham met criteria for an IEA and prepared an IEA certificate. And on July 13, Dr. Johnston determined that Abraham continued to meet criteria for an IEA and prepared another IEA certificate.[6] In preparing the certificates, PA Gibbs and Dr. Johnston acted as part of New Hampshire's mental health services system as a matter of law. See Doe, 174 N.H. at 258; Doe, 657 F. Supp. 3d at 212, 214 n.7. And once the July 8 certificate was completed, Abraham was in the custody of DHHS as a matter of law. See Doe, 174 N.H. at 252-53. Abraham does not allege that the July 8 certificate was thereafter rescinded. At all relevant times, therefore, Abraham was in state custody (either pursuant to the bail order or the IEA certificates) as a result of actions taken by persons or entities other than Elliot (the New Hampshire Circuit Court or approved medical providers acting as part of New Hampshire's mental health services system). Abraham has not alleged facts from which the court can reasonably infer that Elliot itself confined the defendant, or that Elliot took any action resulting in his confinement.[7] See Farrelly, 168 N.H. at 445 (false

---

[6] Neither party argues that reassessments of IEA certificates are impermissible.

[7] In light of this conclusion, the court declines Abraham's request in his surreply that he be afforded leave to amend his complaint to allege that Elliot confined him at Valley Street rather than at Elliot Hospital. Even assuming Abraham could plausibly allege that Dr. Johnston or PA Gibbs had the power to order Valley Street to imprison a patient, amendment would be futile because such confinement would still have come about as a result of approved medical providers acting as part of the state mental health services system as a matter of law. See, e.g., Brady v. Mosca, 707 F. Supp. 3d 154, 166-67 (D.N.H. 2023) (court need not grant leave to amend when it would be futile to do so because amended claim would not overcome a Rule 12 motion).

imprisonment claim requires demonstration that defendant's actions "resulted in the plaintiff's confinement").

Abraham next turns to a treatise relying upon case law from the early twentieth century to argue that "New Hampshire courts adjudicate false imprisonment claims under a burden-shifting framework." Doc. no. 38-1 at 4. He asserts that he need only prove that he was subject to imprisonment, and once "the imprisonment is proven or admitted, the burden of justifying it rests with the defendant." Id. (quoting 8 Richard B. McNamara, New Hampshire Practice Series: Personal Injury: Tort & Insurance Practice § 3.08 (4th ed. 2015) (citing Noyes v. Edgerly, 71 N.H. 500 (1902))). Therefore, Abraham says, the court cannot grant a Rule 12(b)(6) motion for a false imprisonment claim where the plaintiff plausibly alleges he was imprisoned—because, having done so, it is the defendant's burden to prove that the imprisonment was lawful.

Abraham's argument is not persuasive. As an initial matter, more recent cases from the New Hampshire Supreme Court make clear that false imprisonment has four elements under New Hampshire law, all of which the "plaintiff must show." Farrelly, 168 N.H. at 445; accord Ojo v. Lorenzo, 164 N.H. 717, 726 (2013); MacKenzie v. Linehan, 158 N.H. 476, 482 (2009); see also Welch v. Bergeron, 115 N.H. 179, 181 (1975) (affirming dismissal of false imprisonment claim where plaintiff failed to plausibly plead that his detention was unlawful because "the absence of valid legal authority" for the imprisonment is an "essential element"). Indeed, in Farrelly, Ojo, and MacKenzie, the New Hampshire Supreme Court

expressly stated that, to prevail on a false imprisonment claim, a plaintiff has the burden of demonstrating that his imprisonment was undertaken "without legal authority." Farrelly, 168 N.H. at 445; accord Ojo, 164 N.H. at 726; MacKenzie, 158 N.H. at 482. In another section of the treatise Abraham relies upon, the author acknowledges the New Hampshire Supreme Court's "more recent[ ]" formulation of the manner in which false imprisonment claims are to be proven. McNamara, supra § 3.06 (quoting Ojo and citing Farrelly). Finally, regardless of whether Abraham must plausibly allege that his confinement was unlawful, he must plausibly allege that Elliot's actions resulted in his confinement. For the reasons explained above, he has not done so.

For these reasons, Abraham has failed to plead sufficient facts for the court to reasonably infer that Elliot is liable for false imprisonment as alleged in the amended complaint.

## CONCLUSION

Elliot's motion to dismiss (doc. no. 31) is granted. Count VI of the amended complaint is dismissed and the clerk of court shall dismiss Elliot as a defendant in this action.

SO ORDERED.

                                                    _____
                                                    Landya McCafferty
                                                    United States District Judge

September 17, 2024

cc:    Counsel of Record